# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Natheer Abdullah Ramo,                                    Civ. No. 13-1233 (JRT/JJK)

     Plaintiff,

v.

                                            **REPORT AND**

Carolyn W. Colvin,                                       **RECOMMENDATION**
Acting Commissioner of Social Security,

     Defendant.

Jeffrey R. Hannig, Esq., Hanning Law Office, P.A., counsel for Plaintiff.

Ana H. Voss, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Natheer Abdullah Ramo seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability insurance benefits and supplemental security income. The parties have filed cross-motions for summary judgment. (Doc. Nos. 13, 15.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. L.R. 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion for summary judgment be granted for remand and Defendant's motion for summary judgment be denied.

## BACKGROUND

### I.    Procedural History

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on May 7, 2010, alleging a disability onset date of August 1, 2009.  (Tr. 173–76, 195–97.)[1]  The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.  (Tr. 92–98, 100–06.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held on November 23, 2011.  (Tr. 109–10, 25–87.)  On January 10, 2012, the ALJ issued an unfavorable decision on Plaintiff's applications.  (Tr. 7–24.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on April 15, 2013.  (Tr. 1–4.)  Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981; 416.1481.

### II.   Background

Plaintiff was born on November 11, 1965, and on his alleged onset date of disability, August 1, 2009, he was 43-years-old.  (Tr. 173.)  Plaintiff was born in Northern Iraq, where he graduated from teacher's school, and was conscripted into the army.  (Tr. 382.)  After deserting the army, he was caught and taken back.  (*Id.*)  Plaintiff then fled Iraq, becoming a refugee in Turkey.  (*Id.*)  He moved to the United States in 1993.  (Tr. 459.)  He has a wife and five children.

---

[1]    The abbreviation "Tr." is used to refer to the transcript of the administrative record (Doc. No. 11).

(Tr. 382.)  Plaintiff has worked in cleaning, packing, van driving, bus driving, and as a personal care assistant.[2]  (Tr. 250, 265.)  He initially alleged disability due to pain from a pinched nerve in his neck, and later added depression as a cause of disability.  (Tr. 222, 277.)

Plaintiff completed a function report for the SSA (Tr. 266–73) on May 22, 2010, in which he reported the following information: He needed help from his wife to shower because pain in his left arm.  (Tr. 266–67.)  He took hydrocodone for pain relief, and drove using only his right arm.  (Tr. 266.)  He felt drowsy and dizzy, and went to bed between his morning and afternoon school bus routes.  (Tr. 266, 273.)  He could not cook or do any household chores, and he spent his time at home sleeping.  (Tr. 267–68.)  He could not handle finances because of his dizziness.  (Tr. 269.)  He was in too much pain to enjoy being with family or friends.  (Tr. 271.)  He does not handle stress well, and he becomes angry easily.  (*See* Tr. 272.)  He was distracted, and his memory and concentration were poor.  (*See* Tr. 273.)

Plaintiff's motion for summary judgment is based primarily on his mental impairment claims, although he alleges that pain from his physical impairments contributes to his mental limitations.  In his written argument Plaintiff's treatment

---

[2]     The Social Security Administration ("SSA") determined that Plaintiff's work as a personal care assistant from April 4, 2010 through May 1, 2010 was an unsuccessful work attempt that did not preclude his application for disability.  (Tr. 236, 265.)  Otherwise, Plaintiff worked only fifteen hours per week after August 1, 2009, and the SSA recommended this as Plaintiff's alleged disability onset date.  (Tr. 236.)

and evaluation for physical complaints, primarily chronic pain syndrome, are briefly summarized.  The focus of the disability claim is on the evidence relating to Plaintiff's mental impairments.

### A.    Medical Records

### 1.    Physical Impairments

Plaintiff saw his primary care provider, Dr. Ross Kringlie, on November 5, 2009, with symptoms of left arm pain and tingling in the fingers, with onset one month earlier.  (Tr. 361–62.)  Plaintiff had not yet tried any medication.  (Tr. 362.)  Physical examination was essentially normal, and Dr. Kringlie recommended physical therapy, and to follow up with a cervical MRI, if there was no improvement.  (*Id.*)  Several weeks later, Plaintiff's cervical MRI showed bilateral neural foraminal narrowing at multiple levels secondary to degenerative spondylotic[3] change.  (Tr. 350–51.)  There was a moderate sized left lateral disc protrusion at C6-7, in position to contact the left C7 nerve root.  (Tr. 350.)

Plaintiff underwent a neurosurgery consultation with Dr. Chad Justesen on December 14, 2009.  (Tr. 352–54.)  At that time, Plaintiff was an unemployed bus driver, recently laid off.  (Tr. 353.)  He complained of constant neck and arm symptoms, not relieved with physical therapy, traction, chiropractic treatment, or pain medication.  (Tr. 352.)  When Dr. Justesen considered Plaintiff's overall

---

[3]    The term spondylosis is often used nonspecifically to describe any lesion of the spine of a degenerative nature.  *Stedman's Medical Dictionary* 1678 (27th ed. 2000).

health in a review of systems, Plaintiff also complained of increased urination, weight gain, hearing loss, back pain, depression, mood swings and anxiety. (Tr. 353.)  Dr. Justesen diagnosed chronic C7 radiculopathy and recommended surgery or epidural steroid injection.  (*Id.*)

When Plaintiff saw Dr. Kringlie on January 15, 2010, his weight was 218 pounds, and he rated his left arm pain at ten, on a scale of one to ten.  (Tr. 355.) Plaintiff wanted to avoid surgery and would instead have an epidural steroid injection.  (Tr. 356.)  He was depressed, and asked Dr. Kringlie to prescribe an antidepressant.  (*Id.*)  Plaintiff's review of systems was positive for recent weight change, change in energy level, frequent heart burn, neck pain, joint pain, muscle pain, muscle weakness, excessive thirst and urination, and depressed mood.[4]  (Tr. 356–67.)  Dr. Kringlie diagnosed cervical disk disease, gastroesophogeal reflex disease (GERD), and depression; and he prescribed Nexium, Celexa, and hydrocodone with acetaminophen.[5]  (Tr. 358.)  He also referred Plaintiff to a pain clinic for steroid injection.  (*Id.*)

Plaintiff went to a pain clinic on February 8, 2010, and saw Dr. Majid Ghazi.  (Tr. 342–44.)  Plaintiff reported a history of left arm pain, with moderate to severe aching, some numbness and paresthesia, and left hand weakness.  (*Id.*)

---

[4]     The record is conflicting regarding Plaintiff's memory, stating both that there was frequent memory loss and that memory was normal. (Tr. 357–58.)
[5]     Hydrocodone with acetaminophen is also sold under the brand name Vicodin. *Physician's Desk Reference* ("*PDR*") 526 (59th ed. 2005).  The most frequently reported side effects are light-headedness, dizziness, sedation, nausea and vomiting.  *Id.* at 529.

He rated his pain level eight out of ten.  (*Id.*)  Plaintiff also had a history of

depression, and he had lost his job five months prior.  (*Id.*)  On examination,

Plaintiff's range of motion was within normal limits.  (Tr. 343.)  Dr. Ghazi

diagnosed C7 radiculopathy, and he scheduled a selective nerve root block for

the next day.  (Tr. 343, 339)  Plaintiff rated his pre-injection pain level six or

seven out of ten, and after the injection, his pain level reduced to a level of one

out of ten.  (Tr. 339–41.)  His subsequent injection at the end of April reduced his

pain from five out of ten to one out of ten. (Tr. 328–31.)  A few months later, his

pain level was back to nine out of ten.  (Tr. 484–87.)  His next injection was in

October 2010, and he did not get relief from severe pain.  (Tr. 471–74.)  His last

injection was in January 2011, and his pain reduced from a level of nine out of

ten to three.  (Tr. 449–51.)

Plaintiff also took tramadol for pain.[6]  (Tr. 47–48, 358, 575.)  Pain

medication provided some relief but made him sleepy during the day.  (Tr. 48–49,

467.)  Beginning in June 2011, Plaintiff was also evaluated and treated with

medication for leg pain, but the cause was undetermined.  (Tr. 559–60, 572.)

Plaintiff underwent a sleep study with Dr. Kevin Faber on June 2, 2011.

(Tr. 575–79.)  Plaintiff gave the following list of complaints:  (1) he was too

anxious to go to bed before 3:00 or 4:00 a.m.; (2) he awoke often; (3) he had

---

[6]    Tramadol hydrochloride is also sold under the brand name Ultram.  *PDR* at
2551.  Potential side effects include but are not limited to dizziness, nausea,
constipation, headache and somnolence.  *Id.* at 2554.

trouble getting to sleep; (4) he slept about 4 hours in a 24-hour period; (5) he felt

sleepy during the day; (6) he could only nap ten minutes at a time during the day;

(7) he frequently had headaches in the morning; (8) he took tramadol every six

hours as needed for leg pain; (9) he endorsed several parasomnia[7] symptoms,

including sleeptalking, confusional arousals, and kicking or jerking of his legs;

(10) and he endorsed loud snoring.  (Tr. 575.)  Plaintiff did not show evidence of

sleep-disordered breathing, but his sleep efficiency was only 45%.  (Tr. 547–48.)

Plaintiff stated that he could not work because he was too tired during the day.

(Tr. 547.)  Dr. Faber diagnosed insomnia related to anxiety disorder, and

prescribed zolpidem.[8] (Tr. 548.)

### 2.    Mental Impairments

For evaluation of his Social Security disability application, Plaintiff

underwent a consultative psychological evaluation on July 26, 2010, with

Dr. Carol Follingstad.  (Tr. 382–88.)  Plaintiff reported symptoms of memory loss,

pain, isolation, and crying episodes.  (Tr. 382.)  He was working reduced hours

due to pain.  (*Id.*)

Plaintiff was born and raised in Kurdistan and forced to serve in the Iraq

army after graduating teacher's school.  (*Id.*)  He deserted the army after one

---

[7]    Parasomnia is any dysfunction associated with sleep.  *Stedman's* at 1315.

[8]    Zolpidem is also sold under the brand name Ambien.  *PDR* at 2980.
Potential side effects include daytime drowsiness, dizziness, headache, nausea
and vomiting.  *Id.* at 2981.

month, was returned to service for two years, and deserted again.  (*Id.*)  He then

fled to Turkey, where he lived in a refugee camp for three years before coming to

the United States.  (*Id.*)   He was presently married and had five children.  (*Id.*)  In

the United States, Plaintiff drove a city bus, and later a school bus.  (*Id.*)  He then

started having back problems.  (*Id.*)  Plaintiff had not been able to work since

June due to pain.  (Tr. 382–83.)  He had never seen a mental health worker,

because his culture would not allow it.  (Tr. 383.)

Plaintiff described his daily activities as follows: (*Id.*)  He watched television

one hour per night, read for one hour per week, exercised two hours per week,

walked one hour per week, and socialized one hour per week.  (*Id.*)  His activities

were limited by pain and depression.  (*Id.*)  He could complete most tasks without

assistance, but he believed household chores were women's work.  (*Id.*)  He did

outdoor chores and handled the finances.  (*Id.*)  He felt that his current living

situation was less stressful than most of his past life circumstances.  (*Id.*)  His

symptoms were chronic pain, poor mood and anxiety.  (*Id.*)  He spent most of the

day sleeping, because he always felt tired, but he tried to spend time with friends,

so he would not be ostracized in his community.  (*Id.*)

On examination, his posture was poor, and he moved, stood and sat

slowly, with his activity level remaining lethargic throughout the assessment (Tr.

384.)  He became tearful frequently and did not smile.  (*Id.*)  On the other hand,

his speech was normal, his hygiene was good, he was cooperative, attentive,

and easy to interview.  (*Id.*)  He was oriented, and his thought processes were

normal, but his mood was poor due to worry over his finances, unemployment, and family concerns.  (*Id.*)

Plaintiff was given the WAIS-IV intelligence test, and his scores fell within the extremely low range of functioning, suggesting he may need extra reminders, extra time, and constant guidance during mental processing.  (Tr. 384–87.) Dr. Follingstad was not sure whether the test results reflected Plaintiff's true ability or if they were the result of cultural barriers.  (Tr. 387.)  Plaintiff had declined use of an interpreter for testing because he did not want people in his community to know that he was seen for mental health issues.  (Tr. 385.)  He did not appear to understand all of the test instructions.  (*Id.*)  But Dr. Follingstad noted Plaintiff appeared to be truthful in his presentation.  (Tr. 383.)

Dr. Follingstad diagnosed PTSD, severe and recurrent major depressive disorder, generalized anxiety disorder with panic attacks, cognitive disorder NOS,[9] chronic pain under Axis III,[10] and she assessed a GAF score of 45.[11]  (Tr.

---

[9]    NOS is an abbreviation for *Not Otherwise Specified*. NOS conditions are those where the symptom presentation meets the general guidelines for a disorder within a DSM diagnostic class, but the symptoms do not meet the full criteria of a specific disorder. NOS may also be a provisional diagnosis pending additional information or testing. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*")  (American Psychiatric Association 4th ed. text revision 2000).

[10]    If a pain disorder is coded on Axis III, it is not considered a mental disorder.  *Id.* at 499.  Instead, the pain results from a general medical condition and psychological factors play little or no role in the onset or maintenance of pain.  *Id.*

[11]    The Global Assessment of Functioning Scale ("GAF") is used by clinicians to subjectively rate the social, occupational, and psychological functioning of

(Footnote Continued on Next Page)

388.)  She opined that Plaintiff would need a job coach to help him understand work situations.  (*Id.*)  He could understand simple instructions, but he may need visual cues to help him stay on track.  (*Id.*)

On August 30, 2010, A. Johnson, a state agency consultant, reviewed Plaintiff's Social Security disability file on initial review of his disability claim. (Tr. 389–406.)  Johnson opined that Plaintiff had only moderate mental limitations, and that Plaintiff had the mental residual functional capacity:

> to understand, remember and follow simple instructions.  Clt is restricted to work that involved brief, superficial interactions w/ supervisors and the public.  Within these parameters and in the context of performing simple, routine, repetitive, concrete and tangible tasks, clt is able to sustain attention and concentration skills to carry out work-like tasks with reasonable pace and persistence.

(Tr. 399, 403–06.)  Dr. Sharon Frederiksen reviewed Plaintiff's Social Security disability file upon reconsideration of Plaintiff's disability applications on November 30, 2010.  (Tr. 421–23.)  She affirmed Johnson's mental RFC opinion. (*Id.*)

In September 2010, Plaintiff told Dr. Kringlie he was bothered by depression recently, and he asked about restarting medication.  (Tr. 476–77.)  In Dr. Kringlie's review of systems, Plaintiff endorsed depression but did not have trouble sleeping.  (Tr. 477–78.)  Apart from depressed mood, Plaintiff's mental

_____

(Footnote Continued from Previous Page)
adults on a scale of 0 to 100.  *DSM-IV-tr* at 32.  Scores of 41 through 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.* at 34.  Scores of 51 through 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

status examination was normal.  (Tr. 478.)  Dr. Kringlie prescribed Zoloft.  (*Id.*)

At the end of October, Plaintiff reported that Zoloft was not helping, and he was

having trouble sleeping.  (Tr. 467.)  Plaintiff's mood was depressed and his affect

was flat, but his mental status examination was otherwise normal.  (Tr. 468.)  Dr.

Kringlie discontinued Zoloft and prescribed Remeron.  (*Id.*)

Upon referral by Dr. Kringlie, Plaintiff underwent a psychiatric evaluation

with Clinical Nurse Specialist Rebecca Elbert on November 2, 2010.  (Tr. 459–

65.)  Plaintiff reported that he suffered daily depression, anxiety, flashbacks, and

sleep deprivation due to nightmares.  (Tr. 459.)  Remeron helped a little with his

sleep but not with depression or anxiety.  (*Id.*)  Plaintiff told Nurse Elbert that he

graduated ninth in his class as a teacher and taught for one month.  (*Id.*)  Plaintiff

said he would have gone on to college because he graduated in the top 10% of

his class, but he was drafted into the Iraq army.  (Tr. 461.)  He described his war

experiences, and when he fled Iraq, he lived in the mountains for six months with

little food and clothing.  (Tr. 459.)  He was further traumatized because his

brother died during that time.  (*Id.*)  Plaintiff suffered depression, anxiety and

nightmares when he moved to the United States in 1993, and he only slept three

to five hours at night since he was in the Iraq army.  (*Id.*)  He vividly remembers

bombs going off.  (*Id.*)

Plaintiff completed the PHQ-9 depression and GAD-7 anxiety questionnaires,[12] and his respective scores of 26 and 21 suggested severe depression and generalized anxiety.  (Tr. 459–60, 464.)  He found it extremely difficult to work, take care of things at home, and get along with people.  (Tr. 464.)  He was irritable, impatient, and easily angered by other drivers and family members.  (*Id.*)  He did not get along with his wife and children.  (Tr. 460.)  His affect was depressed and anxious, his mood was poor, but otherwise his mental status examination was normal.  (Tr. 461–62.)  Nurse Elbert diagnosed PTSD, generalized anxiety disorder, major depressive disorder, and a GAF score of 50.  (Tr. 462.)

---

[12]    The Patient Health Questionnaire, PHQ-9, is used to screen, diagnose, monitor, and measure the severity of depression.  Center for Quality Assessment and Improvement in Mental Health, available at  http://www.cqaimh.org/pdf/tool_phq9.pdf.   Scores of 15-19 indicate moderately severe major depression that warrants treatment with an antidepressant or psychotherapy.  *Id.*  Scores of 20 and greater indicate severe major depression that warrants treatment with an antidepressant and psychotherapy.  *Id.*  The highest possible score is 27, if the individual has endorsed all nine categories of symptoms occurring nearly every day.  *Id.*

The Generalized Anxiety Disorder Screener, GAD-7, is used to assess for generalized anxiety disorder.  The University of Vermont, College of Medicine, available at http://www.uvm.edu/medicine/ahec/documents/Generalized_Anxiety_Disorder_Screener_GAD7.pdf.   Scores of 8 and above indicate probable anxiety disorder.  *Id.*  The highest possible score, 21, is achieved if the individual endorses the following symptoms occurring nearly every day:  feeling anxious, nervous or on edge; not being able to stop or control worrying; worrying too much about different things; trouble relaxing; being so restless that it is hard to sit still; becoming easily annoyed or irritated; and feeling afraid, as if something awful might happen.  *Id.*

Plaintiff saw Nurse Elbert again on November 30, 2010, and said he was too tired to drive his bus route safely in the morning.  (Tr. 455.)  He felt tired all day and was awake from nightmares at night.  (Tr. 455.)  He had few social supports and felt overwhelmed by family responsibility.  (*Id.*)  His affect was dysphoric and anxious, and his mood was tired and stressed.  (*Id.*)  Plaintiff's depression and anxiety scores on the PHQ-9 and GAD-7, 26 and 21 respectively, were again very high.  (Tr. 458.)  Elbert discontinued mirtazapine[13] and prescribed prazosin.[14]  (Tr. 455.)

The medication change did not help.  (Tr. 452.)  One month later, Plaintiff was still awake at night from nightmares, and he was tired all the time.  (*Id.*)  He also worried that side effects from medication would prevent him from driving a school bus.  (*Id.*)  Upon examination, his grooming was normal, his behavior was pleasant and appropriate, he made good eye contact, his psychomotor activity was normal, his speech was articulate, his thoughts were normal, he was alert and oriented, his memory was intact, and his affect was anxious, but he could smile.  (*Id.*)  Elbert noted he needed a lot of encouragement to take medication,

---

[13]     Mirtazapine is also sold under the brand name Remeron.  *PDR* at 2458.

[14]     Prazosin can be used to treat sleep problems associated with post-traumatic stress disorder.  Medline Plus, available at http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682245.html.  It is also sold under the brand name Minipress.

and she increased Plaintiff's prazosin and hydroxyzine.[15] (Tr. 452–53.)  She

encouraged Plaintiff to contact her frequently about how he was doing.  (Tr. 452.)

Concerning his disability application, she noted that "his mental illness is

definitely impacting his daily function and ability to work."  (Tr. 453.)

Elbert wrote a letter in support of Plaintiff's disability application.  (Tr. 427–

28.)  She opined that PTSD had a big impact on Plaintiff's daily function, causing

chronic sleep deprivation, depression, and anxiety.  (Tr. 427.)  In his current state

of severe depression and high anxiety, she did not believe Plaintiff could work full

time in any job.  (Tr. 427–28.)  She also doubted he could work even half-time

due to his poor concentration, fatigue, irritability and high anxiety.  (Tr. 428.)

Plaintiff decided to change providers; therefore, he underwent a psychiatric

evaluation with Dr. Arvinder Pal S. Gagneja on February 8, 2011.  (Tr. 430–34.)

He complained of poor sleep, fatigue, low energy, depression, and increasing

flashbacks and nightmares.  (Tr. 430.)  His medications were not helping.  (*Id.*)

He felt stressed at home because his wife and children did not listen to him.  (*Id.*)

He missed his culture and had trouble adapting to this country.  (*Id.*)

Upon mental status examination, Plaintiff was appropriate, casual, and

cooperative, with normal energy, speech, and thoughts.  (Tr. 432.)  He appeared

---

[15]     Hydroxyzine, also sold under the brand name Vistaril, is an antihistamine
that may be used short term to treat anxiety or to help an individual feel sleepy or
relaxed before or after surgery.  WebMD available at http://www.webmd.com/
drugs/drug-7092-Hydroxyzine+Pamoate+Oral.aspx?drugid=7092&drugname=
Hydroxyzine+Pamoate+Oral.

oriented, and his memory, attention, and concentration were intact.  (*Id.*)
However, his mood was depressed, anxious, and irritable, although he was able
to smile briefly.  (*Id.*)  Plaintiff scored 25 on the PHQ-9 questionnaire and 21 on
the GAD-7.  (Tr. 434.)  Dr. Gagneja diagnosed PTSD, moderate major
depressive disorder, neck pain secondary to cervical disc degeneration, and
assessed a GAF score of 55.  (Tr. 433.) He prescribed Celexa and Restoril.  (*Id.*)

One month later, Plaintiff told Dr. Gagneja he had not improved.  (Tr. 601.)
Plaintiff reported having occasional palpitations from anxiety, and he was only
sleeping three hours at night.  (*Id.*)  He had passive suicidal ideation.  (*Id.*)  He
was not having side effects from his medication.  (*Id.*)  Tingling in his hands and
poor concentration made it difficult for him to do his morning bus route, but he
was able to do it without any significant problems.  (*Id.*)

Plaintiff scored 27 and 18 respectively on the PHQ-9 and GAD-7.
(Tr. 602.)  Apart from his anxious and depressed mood, his mental status
examination was normal.  (*Id.*)  Dr. Gagneja assessed a GAF score of 50.  (*Id.*)
He reminded Plaintiff to call if the sleep medication was not working, and not to
drive if he was not alert.  (*Id.*)  He increased Plaintiff's medications.  (*Id.*)

On April 11, 2011, Plaintiff had again had high scores on the PHQ-9 and
GAD-7, 26 and 20 respectively.  (Tr. 589–90.)  He reported that his medications
were not working, and that he was sleeping five or six hours during the day after
coming home from work.  (*Id.*)  Dr. Gagneja opined that Plaintiff's affect and
behavior were less depressed and anxious than stated, and that his symptoms

appeared to be exaggerated.  (Tr. 590.)  Nonetheless, Dr. Gagneja prescribed a

new antidepressant, started Adderall, and assessed a GAF score of 50.  (*Id.*)

Adderall would be prescribed short-term until Plaintiff's sleep was improved.  (*Id.*)

Dr. Gagneja told Plaintiff not to sleep during the day if he wanted to sleep at

night.  (*Id.*)

One month later, Plaintiff still had not improved.  (Tr. 580.)  He was

depressed and anxious, and he had nightmares, insomnia, and excessive

daytime fatigue.  (*Id.*)  Dr. Gagneja discontinued Plaintiff's medications and

prescribed Remeron.  (Tr. 581.)  He referred Plaintiff for a sleep study and

psychotherapy, and assessed Plaintiff with a GAF score of 50.  (Tr. 581–82.)

Dr. Gagneja also completed a psychiatric review technique (PRT) form in

support of Plaintiff's disability applications.  (Tr. 488–501.)  He noted at the end

of the form that his evaluation was not focused on evaluating Plaintiff's ability to

work or assessing the extent of his functional limitations for work, and that

Plaintiff should have an independent evaluation for mental disability.  (Tr. 499–

500.)  But he noted that Plaintiff suffered from "chronic problems with depression,

anxiety, flashbacks, and nightmares, with fluctuating symptoms."  (Tr. 498.)

Dr. Gagneja opined that Plaintiff had marked difficulties in social functioning and

in maintaining concentration, persistence or pace, based on his affective and

anxiety-related disorders.  (*Id.*)

On June 16, 2011, Plaintiff reported that he was sleeping better with use of

Remeron, but that his other symptoms remained the same.  (Tr. 567.)  Plaintiff

was getting a divorce and applying for disability.  (*Id.*)  His mental status examination was normal, except for depressed and anxious mood and depressed affect.  (Tr. 568.)  Dr. Gagneja assessed a GAF score of 50.  (*Id.*)  The next month, Plaintiff said he was looking for an apartment.  (Tr. 555.)  He stated that his wife had tried to hurt herself and blamed him for it so he would go to jail.  (*Id.*)  His sleep was much better, but he felt sedated during the day and wanted a change in medication.  (*Id.*)  His mood remained depressed and anxious, and he thought about jumping in a river, but he would not do it.  (Tr. 556.)  His mental status was unchanged.  (*Id.*)  Dr. Gagneja prescribed Zoloft, and assessed a GAF score of 50.  (Tr. 557.)

Plaintiff underwent an evaluation for psychotherapy on September 13, 2011, with Katherine Helm, a licensed professional counselor.  (Tr. 542.)  Plaintiff said that he was more depressed in the last five to six months, and that his flashbacks and nightmares were increasing.  (*Id.*)  He could not sleep, and he was under stress at home while pursuing a divorce.  (*Id.*)  He felt very irritable and angry much of the time and had lashed out at his children.  (*Id.*)  He had no friends and missed his culture.  (Tr. 543.)  He had not been eating, and had lost twenty-five pounds over three or four months.  (*Id.*)  He was fatigued, forgetful, anxious, and worried, and had suicidal thoughts almost every day.  (*Id.*)

Apart from his anxious, depressed and irritable mood, Plaintiff's mental status examination was normal.  (Tr. 544.)  He felt ambivalent that psychotherapy would help with flashbacks from the war.  (Tr. 545.)  Helm diagnosed moderate

to severe depression and generalized anxiety disorder, and assessed a GAF score of 48.  (*Id.*)

Plaintiff followed up with Dr. Gagneja on September 19, 2011.  (Tr. 538–41.)  He had lost his job but obtained a new school bus driving job.  (Tr. 538.)  He was concerned about his ability to drive in the winter.  (*Id.*)  Despite his poor sleep, he was managing to drive the bus, drinking coffee to maintain his attention.  (*Id.*)  Plaintiff was living with a friend now, pending his divorce and a long waiting list for housing.  (*Id.*)  He was faced with the possibility of losing his medical insurance because he did not have a permanent address.  (*Id.*)  He was very distressed about moving into a homeless shelter, and was considering returning to Iraq, but he did not know how he would support himself there.  (*Id.*)

Plaintiff's PHQ-9 and GAD-7 scores of 27 and 21, respectively, reflected severe depression and anxiety.  (Tr. 541.)  Dr. Gagneja replaced Plaintiff's medications of Ambien and Zoloft with trazadone and Paxil.  (Tr. 539.)  Dr. Gagneja considered partial hospitalization, but managing Plaintiff's psychosocial stressors was the most important treatment at that time.  (Tr. 540.)  Dr. Gagneja diagnosed severe major depressive disorder, generalized anxiety disorder, rule out PTSD, and he assessed a GAF score of 45.  (*Id.*)

## III.    Testimony at the Administrative Hearing

**Claimant's Testimony.**  Plaintiff, represented by counsel, testified at a hearing before the ALJ on November 23, 2011.  (Tr. 30–72.)  At the time of the hearing, Plaintiff lived with his wife and five children, aged five to eighteen.  (Tr.

32.)  Plaintiff was 5'10" and weighed 205 pounds, after gaining more than twenty

pounds over a two-year period.  (Tr. 33.)

In 1986, Plaintiff obtained a teaching degree in Kurdistan, which required

three years education beyond middle school.  (Tr. 34.)  After teaching for forty

days, he was conscripted into the Iraq army.  (Tr. 61.)  He testified that he was in

the Iraq army from 1986 until 1990, and witnessed horrifying things during that

time.  (Tr. 36, 61.)  He had to leave Iraq because he was a Kurd, and he lived in

a refugee camp for several years.  (Tr. 62.)  He had terrible experiences fleeing

Iraq, and in the refugee camp.  (*Id.*)  He came to the U.S. in 1993 and became a

citizen.  (*Id.*)  He first lived in Connecticut while working as a parking valet, but

moved to Fargo-Moorhead to allow his children to go to a good school.  (Tr. 62–

63.)

After the move to Minnesota, he started noticing symptoms of depression

and flashbacks from the war and fleeing Iraq.  (*Id.*)  His first job in Fargo-

Moorhead was driving a city bus in Fargo from 2004–2008, but he quit the job in

September 2008 because he was not getting enough sleep due to flashbacks

and was concerned that lack of sleep was affecting his ability to safely drive a

bus.  (Tr. 64–65.)  He was sleeping a couple hours off and on at night, and

having trouble with flashbacks from the war.  (Tr. 65.)  He also quit a home

healthcare job due to depression and pain in his arms.  (Tr. 66–67.)

Plaintiff was presently working for a school bus company, where he was

hired in September 2011.  (Tr. 37.)  He was driving two school bus routes per

day, five days a week.  (Tr. 39.)  His bus route took 45 minutes to an hour.

(Tr. 48.)  There was a helper on the bus, but all buses with special needs

children had bus helpers.  (Tr. 40.)  Plaintiff had a commercial driver's license

that he obtained in 2004, and renewed every two years without having to take a

test. (Tr. 43–44.)  His wife is disabled and does not work.  (Tr. 41.)

Plaintiff testified that he felt tired and lacked energy every day.  (Tr. 68–

69.)  He had trouble concentrating and remembering.  (Tr. 69.)  He had suicidal

thoughts but would not act on them because it was forbidden by his religion.  (*Id.*)

He was fearful of others, and if provoked, would fight.  (Tr. 69–70.)  In public, he

was afraid he was being followed, and he cried often.  (Tr. 70.)  He did not get

along with his wife or children and was getting a divorce.  (Tr. 70.)  He did not

want to live with them, but he was having a hard time finding somewhere else to

live.  (Tr. 70–71.)

Plaintiff needed help from his wife to dress, but he could groom himself.

(Tr. 42.)  He did not help with housework due to his depression and arm pain.

(*Id.*)  He did not have any hobbies or interests.  (Tr. 43.)  He was no longer going

to a doctor regularly because he did not have insurance.  (Tr. 44–45.)  His

treatment for depression, anxiety and insomnia was not effective, and he was

getting worse.  (Tr. 45.)

Plaintiff also had constant pain in his arms.  (Tr. 47.)  The pain was treated

with hydrocodone and cortisone shots, and it was caused by a pinched nerve.

(Tr. 47–48.)  Plaintiff rated the severity of his pain as nine on a scale of one to

ten.  (Tr. 48.)  Driving made his pain worse, although medication helped for a while.  (*Id.*)  After taking medication, his pain was seven on a scale of one to ten.  (Tr. 49.)  However, the medication made him dizzy and sleepy.  (Tr. 49.)  He was afraid to have surgery, and his chances of improvement were not good.  (Tr. 50.)  Plaintiff did not think he could work eight hours a day, even if he could sit, stand, or walk as needed.  (Tr. 57.)  He had to lie down and take three or four fifteen minute naps during the day.  (Tr. 58.)

Plaintiff further testified that he suffered depression every day, and it became severe in 2008.  (Tr. 50.)  The medications Dr. Gagneja prescribed were not helping, and they caused sleepiness, tingling in the fingers, and dizziness.  (Tr. 51.)  Plaintiff had no friends, but he went to a mosque once a day.  (*Id.*)  He had trouble talking to people, and believed people feared him because of his accent.  (Tr. 51–52.)  Plaintiff had difficulty concentrating; for example, he could not remember what he just read.  (*Id.*)  He watched Iraq or Kurdish television for brief periods.  (*Id.*)  He read the Quran.  (Tr. 53.)  He does not play games or use a computer.  (*Id.*)

**Medical Expert Testimony.**  Dr. Stephan Podrygula testified as a psychological expert at the hearing.  (Tr. 72–77.)  He stated that Plaintiff's medically determinable mental impairments were depression, anxiety disorder, and chronic pain syndrome.  (Tr. 74.)  Plaintiff met the A criteria of Listing 12.04, Affective Disorders.  (*Id.*)  Under the B criteria of 12.04 and 12.06, Anxiety Disorders, Plaintiff had moderate to marked restriction in activities of daily living.

(Tr. 75.)  Some of Plaintiff's restrictions were due to pain rather than depression and anxiety, so Dr. Podrygula did not rate the depression and anxiety disorders alone as marked.  (*Id.*)

He also rated Plaintiff's difficulties in social functioning as moderate to marked, and difficulties with concentration, persistence or pace were "definitely" marked.  (*Id.*)  Plaintiff consistently functioned at a fairly low level.  (*Id.*)  If Plaintiff's chronic pain impairment[16] were added into the mix, Dr. Podrygula would rate activities of daily living as markedly restricted as well.  (Tr. 76.)   In sum, Dr. Podrygula believed Plaintiff's mental impairments equaled Listings 12.04 and 12.06.  (*Id.*)

**Vocational Expert Testimony.**  Warren Haagenson testified at the hearing as a vocational expert.  (Tr. 77–86, 305.)  The ALJ posed a hypothetical vocational question about a person of Plaintiff's age, education and work experience, who was limited to the following:  lifting twenty pounds occasionally,

---

[16]    Dr. Podrygula identified chronic pain syndrome as falling under Listing 12.07.  (Tr. 76.)  Listing 12.07 describes Somatoform Disorders, defined as physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.07 (2011), *available at* http://ssa.gov/OP_Home/cfr20/404/404-app-p01.htm. There must be medically documented evidence of one of the following:  (1) a history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or (2) persistent nonorganic disturbance of one of the following:  vision, speech, hearing, use of a limb or its movement and control or sensation, and (3) unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury.  *Id.* § 12.07(A).

ten pounds frequently; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; occasionally climb ramps or stairs; occasionally perform overhead work with the left arm; understand, remember and carry out simple and detailed but not complex tasks; maintain concentration, persistence or pace for two to four hours; occasionally interact with coworkers and the public; and tolerate normal supervision. (Tr. 80–81.) Haagenson testified that such a person could perform Plaintiff's past work as a valet driver, and other jobs in the national economy such as small parts bench assembly,[17] poly-packer,[18] and motel cleaner.[19] (Tr. 81.)

For a second hypothetical question, the ALJ further limited the individual to standing and walking two hours per day and sitting six hours per day; carrying out only simple tasks, maintaining concentration, persistence or pace for two hours; and limited to only brief and superficial interaction with coworkers and the public. (Tr. 81–82.) Haagenson testified that the person could perform "elemental industrial jobs" of which there were 87 categories of sedentary jobs listed in the DOT. (Tr. 82.) Three examples were assembler of eyeglass

---

[17]    Dictionary of Occupational Titles Code ("DOT") 706.684-022, with more than 10,000 such jobs in a five-state region. (Tr. 81.)

[18]    DOT Code 920.686-038, with 3,800 jobs in the regional economy. (Tr. 81.)

[19]    DOT Code 323.687-014, with over 12,000 jobs in the regional economy. (Tr. 81.)

frames,[20] lens inserter,[21] and stuffer of toys or sport equipment.[22]  (*Id.*)

Combined there were about 3,100 of those jobs in the regional economy.  (*Id.*)

The ALJ posed a third hypothetical question, limiting the individual to

sedentary work with an option to alternate sitting and standing every thirty

minutes, and with the remaining postural and mental limitations contained in the

second hypothetical question.  (Tr. 82–83.)  The ALJ clarified that the person

would not have to stand for thirty minutes, but would have the opportunity to

stand up before sitting again.  (Tr. 83.)  Haagenson testified that, based on his

experience, the bench assembly jobs could be performed in that manner.  (Tr.

83–84.)  Haagenson also testified that competitive employment would be ruled

out by the need for a job coach.  (Tr. 85.)

## IV.   The ALJ's Findings and Decision

On January 10, 2013, the ALJ issued a decision concluding that Plaintiff

was not under a disability, therefore denying Plaintiff's applications for disability

insurance benefits and supplemental security income.  (Tr. 7–24.)  The ALJ

found that Plaintiff had not engaged in substantial gainful activity since his

alleged onset date of August 1, 2009.  (Tr. 12.)  He found that Plaintiff had the

following severe impairments:  cervical disc herniation at C6-7, major depressive

---

[20]   DOT No. 713.687-018. (Tr. 82.)

[21]   DOT No. 713.687-026.  (Tr. 82.)

[22]   DOT No. 713.685-014.  (Tr. 82.)

disorder, and post-traumatic stress disorder.  (20 C.F.R. §§ 404.1520(c) and

416.920(c)).  (Tr. 13.)

**Listing of Impairments.**  The ALJ determined that Plaintiff's physical and

mental impairments did not meet or medically equal one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13–14.)  Specifically, Plaintiff

did not meet the "B criteria" of Listings 12.04 and 12.06.  (Tr. 13.)  Plaintiff had

only mild restrictions in activities of daily living because he worked as a bus

driver and earned substantial gainful levels in the third quarter of 2009 and

second quarter of 2010.  (*Id.*)  In social functioning, Plaintiff had moderate

difficulties because he had some difficulty getting along with others.  (Tr. 14.)  On

the other hand, in a consultative examination, Plaintiff was cooperative, easy to

interview, attentive, able to respond to most questions, and made good eye

contact.  (*Id.*)  Plaintiff also had moderate difficulties in maintaining concentration,

persistence, or pace.  (*Id.*)  Although his IQ scores indicated that he functioned in

an extremely low range, the scores were affected by cultural barriers.  (*Id.*)  In

recent examinations, Plaintiff's memory, attention, and concentration were intact.

(*Id.*)  He had not suffered any episodes of decompensation.  (*Id.*)

**Residual Functional Capacity.**  At the next step, the ALJ found that

Plaintiff had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except
> with the following limitations:  stand or walk for two hours in an eight
> hour workday; sit for six hours in an eight hour workday; never climb
> ladders, ropes or scaffolds; occasionally climb ramps or stairs;
> occasionally balance, stoop, kneel, crouch, and crawl; only

occasional overhead work with the left arm; can understand, remember, and carry out simple, but not detailed or complex tasks; can sustain concentration, persistence or pace for two hours; and, brief and superficial interaction with coworkers and the public, and can tolerate normal supervision.

(Tr. 14–15).

In reaching this RFC determination, the ALJ noted that Plaintiff said he engaged in fairly limited daily activities, but he also said he did not do housework because it was women's work.  (Tr. 16.)  Plaintiff worked as a school bus driver since the alleged onset date.  (*Id.*)  Although Plaintiff said he needed a helper on the bus, all buses that drove special needs students had a helper, and it was not an accommodation for Plaintiff.  (Tr. 16, 14, 40.)

The ALJ found that the objective evidence did not support greater than light exertional level restrictions, citing evidence that in August 2009, Plaintiff did not complain of neck pain, and there was no neck impairment on examination. (*Id.*)  Although Plaintiff had a cervical disc herniation that could cause arm pain, the ALJ discounted his pain complaints because his examination was normal in November 2009, his strength was mostly normal in December 2009, and in February 2011, he had normal muscle tone and strength.  (*Id.*)  Furthermore, Plaintiff's treatment for pain, particularly nerve root blocks, was successful.  (*Id.*)

The ALJ also found inconsistencies in the record with Plaintiff's complaints of severe mental health symptoms.  (Tr. 17.)  In January 2011, Plaintiff denied having the following symptoms: trouble sleeping, mood swings, depression, suicidal thoughts, nervousness and frequent memory loss.  (*Id.*)  In February and

April 2011, his mental status examinations were inconsistent with his subjective complaints.  (*Id.*)  Also in April 2011, a treating provider opined that Plaintiff's mental symptoms were exaggerated.  (*Id.*)  The ALJ discounted evidence of GAF scores indicating severe mental symptoms, because GAF scores are a snapshot of a particular time, and not indicative of overall ability to function.  (*Id.*)

The ALJ gave significant weight to the state agency psychological consultant's opinion (Ex. 5F), finding it consistent with the evidence and with the claimant's current work activity.  (*Id.*)  The ALJ gave some weight to Dr. Follingstad's opinion, agreeing with the opinion that Plaintiff can understand simple instructions, but not agreeing that he needed a job coach because he was currently working without supervision.  (*Id.*)  The ALJ also agreed that Plaintiff's IQ scores may not be indicative of his true level of functioning.  (*Id.*)

The ALJ gave little weight to the opinion contained in Exhibit 11F (Nurse Elbert's opinion), claiming the issue of disability is reserved for the Commissioner.  (Tr. 18.)  The ALJ also gave little weight to Dr. Gagneja's opinion because his evaluation was not focused on Plaintiff's ability to work, the extent of Plaintiff's depressive symptoms on functioning was not the focus of his treatment, and Dr. Gagneja noted exaggerated symptoms.  (*Id.*)

The ALJ accepted the medical expert's diagnosis of PTSD but did not accept the diagnosis of chronic pain syndrome because it was not mentioned in the record, and because the 2011 treatment notes did not indicate neck pain. (*Id.*)  The ALJ also found that the medical expert incorrectly identified symptoms

of weight change and psychomotor agitation.  (*Id.*)  The ALJ accepted the

medical expert's opinion of Plaintiff's moderate to marked restrictions in activities

of daily living because Plaintiff testified that he did not perform household

activities due to left arm pain.  (*Id.*)  The ALJ did not accept the medical expert's

opinion of Plaintiff's marked limitations in concentration, persistence, or pace,

finding this to be inconsistent with work activity as a bus driver, and with the

medical evidence as a whole.  (*Id.*)

**Vocational Findings.**  At step four of the disability determination

procedure, the ALJ found that Plaintiff was not capable of performing his past

relevant work.  (Tr. 18–19.)  At step five of the disability determination procedure,

the ALJ found there were jobs that exist in significant numbers in the national

economy that the claimant can perform including eyeglass frames assembler,

lens inserter, and stuffer.  (Tr. 19–20.)  Thus, Plaintiff was not under a disability

as defined by the Social Security Act, from August 1, 2009, through the date of

the ALJ's decision.  (Tr. 20.)

## DISCUSSION

### I.    Standard of Review

Review by this Court of the Commissioner's decision to deny disability

benefits to a claimant is limited to a determination of whether the decision of the

Commissioner is supported by substantial evidence on the record as a whole.  42

U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is

a notable difference between 'substantial evidence' and 'substantial evidence on

the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199 (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed if supported by substantial evidence, even if there is also substantial evidence support the opposite finding).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a);

*Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).   Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff generally alleges two errors by the ALJ.   First, he contends the ALJ erred by finding he did not meet or equal Listings 12.04 and 12.06, as opined by the medical expert and Dr. Gagneja, and supported by other evidence in the record.   (Doc. No. 14, Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") 15–38.)[23]   Second, Plaintiff asserts the ALJ's RFC finding is not

---

[23]    Plaintiff argues that the ALJ's listing analysis consists almost entirely of the ALJ's opinions of Plaintiff's level of functioning, and the ALJ improperly substituted his medical opinion for that of Plaintiff's medical providers, whose opinions he did not discuss in this section of his decision.   (Pl.'s Mem. 16–17.) Plaintiff, however, notes that the ALJ's entire decision might apply to his listing analysis.

The Eighth Circuit has held that a deficiency in opinion writing technique by the ALJ does not warrant reversal when the deficiency has no bearing on the outcome of the case.   *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008).   Thus, if the ALJ correctly analyzed the medical opinions and GAF scores under a different section of his decision, the fact that the ALJ did not analyze this evidence specifically under the listing analysis has no bearing on the outcome. The Court will consider the ALJ's entire decision in evaluating the listing analysis.

supported by substantial evidence in the record because the ALJ improperly

discounted the treating and examining providers' opinions and Plaintiff's GAF

scores, and relied solely on the opinion of a nonexamining consultant. (*Id.* at 38–

39.)  For reasons described below with respect to the opinions and medical

evidence obtained through particular medical care providers, consultants, and

experts, the Court recommends that this matter be remanded to the

Commissioner for further consideration.

**Medical Expert Opinions.**  A significant concern for the Court arises out

of the medical expert's testimony at the hearing and the ALJ's analysis and use

of that testimony.  The medical expert, Dr. Podrygula, opined that when Plaintiff's

depression, anxiety, and chronic pain syndrome were considered together,

Plaintiff equaled Listing 12.04, affective disorders, and possibly 12.06, anxiety

disorder, because those impairments caused Plaintiff marked limitations in daily

activities and social functioning, and difficulty in maintaining concentration,

persistence, or pace.  (Tr. 74–76.)  Nonetheless, in his decision the ALJ stated

that he "does not accept the diagnosis for chronic pain syndrome. This

impairment is not mentioned anywhere in the medical record."  (Tr. 18.)  In fact,

the claimant's experience with neck and leg pain was frequently and consistently

indicated in the medical record, (Pl.'s Mem. 22-26), s*ee supra* pp. 21-22, and the

hearing expert's diagnosis of chronic pain was not without a basis in the record.

The Court concludes that the ALJ erred by wholly discounting the medical

expert's diagnosis of chronic pain syndrome.[24]

When a claimant has multiple impairments the Commission must consider

the combined effect of all impairments without regard to whether any particular

impairment, viewed separately, would be sufficiently severe to be disabling.

*Morkemo v. Astrue*, No. 08-2047, 2009 WL 2780365 at *3 (W. Dist. Ark. Aug. 27,

---

[24]     "Chronic pain syndrome" is not defined in the DSM-IV-tr.  Chronic pain syndrome (CPS) is:

> a chronic problem that presents a major challenge to health-care providers because of its complex natural history, unclear etiology, and poor response to therapy.  CPS is a poorly defined condition. Most authors consider ongoing pain lasting more than 6 months as diagnostic, and others have used 3 months as the minimum criterion.  In chronic pain, the duration parameter is used arbitrarily. Some authors suggest that any pain that persists longer than the reasonably expected healing time for the involved tissues should be considered chronic pain.

Manish K. Singh, M.D., Jashvant Patel, M.D., Rollin M. Gallagher, M.D., *Chronic Pain Syndrome*, *available at* http://emedicine.medscape.com/article/310834-overview (updated June 27, 2012).

The DSM-IV-tr contains diagnostic criteria for pain disorder, which is specified as chronic if the condition lasts six months or longer.  *DSM-IV-tr* at 503. The diagnostic criteria are as follows:  (A)  pain in one or more anatomical sites is the predominant focus of the clinical presentation; (B) pain causes clinically significant distress or impairment in social, occupational or other important areas of functioning; (C) psychological factors have an important role in the onset, severity, exacerbation or  maintenance of pain; (D) the pain is not intentionally feigned, as in malingering; (E) the pain is not better accounted for by a mood disorder or psychotic disorder.  *Id.*  If the diagnosis of pain disorder is coded on Axis III, it is not considered a mental disorder; the pain results from a general medical condition, and psychological factors play little or no role in the onset or maintenance of pain.  *Id.* at 499.

2009) (citing *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).)  The ALJ may have been correct in observing that the medical record did not contain a specific diagnosis of chronic pain syndrome, but the record did contain substantial evidence that the claimant had often reported arm and neck pain, and sometimes leg pain, over a significant period of time.  (Pl. Mem. 23-26.)  From this record, the expert could reasonably infer such a diagnosis.  The ALJ in this case did not properly consider the claimant's pain issues, including possible chronic pain syndrome. This Court therefore concludes that a consultative medical examination would be appropriate for purposes of determining the impact of pain and the claimant's limitations and difficulties for purposes of meeting Class B Listings criteria.[25]   Accordingly, this matter should be remanded for development of the chronic pain syndrome diagnosis and consideration of pain in combination with mental impairments with respect to Listings criteria.[26]

---

[25]    Though it is not necessarily in error, *see supra* note 23, it is somewhat puzzling why the ALJ directly discussed the expert's testimony only in relation to residual functional capacity when the expert's testimony largely addressed Listings criteria, with little or no discussion of functional limitations.

[26]    Upon specific inquiry from the ALJ, the medical expert indicated that he would consider chronic pain syndrome in the context of Listing 12.07, Somatoform disorders, resulting in marked restrictions in activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  (*See* Tr. 76.)  However, a pain disorder is not a somatoform disorder under Listing 12.07 if there are demonstrable organic findings or known physiological mechanisms to explain the pain symptoms.  *See supra* note 24.  On the other hand, chronic pain from an identified organic cause might not easily fit into the mental impairment analysis for Listings 12.04 and 12.06.  Plaintiff's arm pain was caused by radiculopathy from cervical disc

(Footnote Continued on Next Page)

**Treating Psychiatrist Opinion.**  Remand is appropriate for other reasons

as well.  Dr. Gagneja, M.D., the only treating provider to offer an opinion

regarding the Listings, completed a Psychiatric Review Technique ("PRT") form

indicating that Plaintiff had marked limitations in social functioning and

maintaining concentration, persistence, or pace, under Listings 12.04 and 12.06.

(Tr. 498–501.)  The ALJ gave "little weight" to Dr. Gagneja's opinion because his

"evaluation was not focused on ability to work [and] the extent of depressive

symptoms on functioning was not the focus of treatment."  (Tr. 18.)  Plaintiff

contends the ALJ erred by discounting Dr. Gagneja's opinion and in failing to

consider the opinion in the context of a Listing, for which the PRT form is

intended, but instead considered Dr. Gagneja's opinion for RFC purposes.  (Pl.'s

---

(Footnote Continued from Previous Page)
disease contacting the C7 nerve root, a demonstrable organic finding, (Tr. 350, 353), referenced by the expert as pain, apparently from a pinched nerve, (Tr. 75), and therefore having an organic origin.  It appears to the Court that in this instance the Plaintiff has multiple impairments, physical as well as mental, and that the medical expert was striving to assess them in combination, while the ALJ was viewing them largely separate for Listings analysis purposes.  Even though recognizing the "murky overlap between pain and mental disorders," (Tr. 76), the ALJ declined to accept the medical expert's diagnosis of chronic pain syndrome, whether organically or mentally derived, and its implications with respect to the Listings.  (Tr. 18).
   Conceivably, but doubtfully, Dr. Podrygula could have been referring, to Plaintiff's leg pain, for which no physical explanation was found. (Tr. 560, 572.) Plaintiff began treatment for leg pain in June 2011.  (Tr. 571–74.)  Plaintiff told Dr. Faber, a sleep specialist, that he took tramadol every six hours for leg pain. (Tr. 576.)  Because there is some evidence that could support a somatoform disorder under Listing 12.07, the ALJ should have further questioned Dr. Podrygula about his opinion, including the nature and extent of leg pain, as well.

Mem. 28–30.)   Although the Court concludes that it was not error for the ALJ to discount Dr. Gagneja's findings on the PRT form, because Dr. Gagneja himself suggested that Plaintiff should have an independent psychiatric evaluation to determine his ability to work, (Tr. 499), the Court agrees with Plaintiff's contention that the ALJ failed to fully and fairly develop the record.   (Pl.'s Mem. 16.)   The ALJ should have ordered a consultative psychiatric evaluation to make such a determination on the claimant's ability to work.

**Psychiatric Evaluation.**   Similarly, Plaintiff underwent a consultative psychiatric evaluation with Dr. Carol Follingstad, Psy.D.,L.P., and the results of that evaluation support greater mental functional limitations than found by the ALJ.   (Tr. 388.)   Dr. Follingstad noted that the results on certain cognitive functioning tests, i.e. WAIS-IV[27] test and WMS-IV[28] test, may not have been a true indicator of Plaintiff's functioning, because cultural factors may have affected the test scores.   (Tr. 387.)  Without further analysis of the issue, the ALJ rejected Dr. Follingstad's opinion, presuming the low scores were in fact a result of cultural barriers as cautioned by Dr. Follingstad.   (Tr. 14.)  The ALJ did not explore this issue with the medical expert at the disability hearing, Dr. Podrygula, who testified that Plaintiff met or equaled Listing 12.04 and possibly 12.06.   (Tr. 74–76.)  And it is unknown whether Dr. Podrygula based his opinions on the questionable test scores.  Because the ALJ did not cite any evidence in support

---

[27]    Wechsler Adult Intelligence Scale, Fourth Ed.
[28]    Wechsler Memory Scale, Fourth Ed.

of his conclusion that cultural barriers were the actual cause of Plaintiff's low test scores, remand is necessary for further development of the record as to the impact of cultural factors on test scores that form the basis for opinions and decisions on cognitive functioning issues.

**Global Assessment of Functioning ("GAF") Scores.**[29]  Plaintiff further contends that his GAF scores support finding that he experiences the severity of symptoms needed to establish marked limitations in activities of daily living, social functioning, and maintaining concentration, persistence, or pace.  (Pl.'s Mem. 18–21.)  GAF scores are not definitive of disability.  *See Jones v. Astrue*, 619 F.3d 963, 973–74 (8th Cir. 2010) ("[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." (internal citation omitted)).  Nevertheless, the Eighth Circuit has found that an ALJ's RFC findings "were not supported by substantial evidence on [the] whole record, in part due to [the] ALJ's failure to discuss or consider numerous GAF scores below 50."  *Conklin v. Astrue*, 360 Fed. App'x 704, 707 (8th Cir. 2010) (citing *Pate-Fires v. Astrue*, 564 F.3d at 944–45 (8th Cir. 2008)).  Here, Plaintiff was assessed with GAF scores of 50 or below on nine occasions over a fourteen month period, with only one intervening GAF score of 55.  (Tr. 388, 462, 433, 602, 590, 581, 568, 557, 545, 540.)  This Court concludes that the ALJ erred by dismissing Plaintiff's GAF scores as merely a "snapshot of . . . the claimant's

---

[29]     *See supra*, note 11.

level of functioning . . . not an indication of overall functioning." (Tr. 17.)  The

"snapshot in time" here was much of the relevant time period for determination of

disability, July 2010 through September 2011.

Given Plaintiff's diagnosis of PTSD, his service in Iraq wars and years as a

refugee, along with Nurse Elbert's opinion that PTSD had a substantial impact on

Plaintiff's daily function, causing chronic sleep deprivation, depression, and

anxiety, the Court finds that the ALJ should have considered the relation of

Plaintiff's GAF scores to his depressive and PTSD symptoms.  Plaintiff's GAF

scores are consistent with Plaintiff's scores on the Patient Health Questionaire

("PHQ-9") and Generalized Anxiety Disorder ("GAD-7"), and are potentially

relevant to his poor test performance with Dr. Follingstad.  If Plaintiff's poor test

performance was attributable to mental impairments and not cultural factors, the

ALJ erred by discounting his intelligence test scores and his GAF scores, as well

as Dr. Follingstad's opinion.

**Substantial Evidence.**  The Commissioner contends that the ALJ's

decision is substantially supported by Dr. Gagneja's April 2011 observation that

Plaintiff's symptoms were exaggerated.  (Doc. No. 16, Def.'s Mem. in Supp. of

Mot. for Summ. J. 9.)  On multiple occasions, including April 2011, Plaintiff

scored the highest possible scores, or one point below the highest possible

score, on the PHQ-9, the GAD-7 forms.  (Tr. 459–60, 464, 541, 458, 589.)  But

Dr. Gagneja only noted Plaintiff's symptoms to be exaggerated on one occasion.

And even if Plaintiff's complaints were exaggerated on these questionnaires, he

could still fall well within the range of serious mental symptoms, because a PHQ-9 score of twenty or greater indicates severe depression, and any score of eight or more on the GAD-7 falls within the highest category.[30]  The scores on these questionnaires could explain why, on all but one occasion, every provider who examined or treated plaintiff, including Dr. Gagneja, assessed a GAF score of 50 or below.

Finally, the ALJ adopted the opinion of a nonexamining state agency consultant, A. Johnson, in the face of contrary opinions from Plaintiff's treating psychiatrist, the consultative examiner, the medical expert at the hearing, and Plaintiff's therapist.  Non-treating physicians' opinions alone are not substantial evidence in the face of the conflicting assessment of a treating physician.  *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole.") (quoting *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003)).   Johnson reviewed only the medical records in Plaintiff's file as of August 2010, when Plaintiff had only been evaluated for mental impairments on one occasion, by the consultative examiner. (Tr. 389–406.)

---

[30]     *See supra* note 10.

Plaintiff explained to Dr. Follingstad that his culture did not allow mental health treatment, and he did not want an interpreter for testing because it could get back to his community that he was being seen for mental health issues. (Tr. 383, 385.)  After Plaintiff saw Dr. Follingstad, he began mental health treatment with Dr. Gagneja and others, but Johnson did not review those records.  The state agency consultant who reviewed and affirmed Johnson's opinion on November 30, 2010, Dr. Frederiksen, also reviewed few of Plaintiff's mental health treatment records (Tr. 421–23), because much of his mental health treatment occurred on or after November 30, 2010.  Yet, the ALJ rejected the hearing testimony from Dr. Podrygula, a psychological expert, who had reviewed the entire record.  (*See* Tr. 72–77.)

Based on all of the above, this Court concludes that there are unanswered questions about the Listings analysis, and because substantial evidence does not support the ALJ's mental RFC finding, remand is necessary for further development of the record at steps three and four of the disability evaluation process.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 13), be **GRANTED FOR REMAND**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 15), be

**DENIED**; and

3.      The case be remanded pursuant to Sentence 4 of 42 U.S.C.

§ 405(g), for further proceedings consistent with this Opinion; and

4.      The case be **DISMISSED WITH PREJUDICE**, and judgment be

entered accordingly.


Date: February 18, 2014          _s/Jeffrey J. Keyes_____
                                 JEFFREY J. KEYES
                                 United States Magistrate Judge


Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**March 4, 2014,** a writing which specifically identifies those portions of this Report
to which objections are made and the basis of those objections.  Failure to
comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo review of those portions to which objection is made.  This Report
and Recommendation does not constitute an order or judgment of the District
Court, and it is therefore not appealable to the Court of Appeals.